IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ANTHONY REED, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No: 08 C 2423 |
| v. | ) |
| | ) Magistrate Judge Jeffrey Cole |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**MEMORANDUM OPINION AND ORDER**

The plaintiff, Anthony Reed, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 423(d)(2), and Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1382c(a)(3)(A). Mr. Reed asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

**I.
PROCEDURAL HISTORY**

Mr. Reed applied for DIB and SSI on January 16, 2004, alleging that he had been disabled since February 1, 1993, due to lower back problems, hypertension, diabetes, arthritis, and some heart problems. (Administrative Record ("R.") 134-136). His application was denied initially and upon reconsideration. (R. 66-68). Mr. Reed continued pursuit of her claim by filing a timely request for hearing.

An administrative law judge ("ALJ") convened a hearing on August 9, 2006, (R. 969), which was continued twice in order to supplement the medical record. (R. 999,

1023). Mr. Allen, represented by counsel, appeared and testified at the hearings. (R. 969, 999, 1023). In addition, Frank Mendrick testified as a vocational expert, and Dr. Bernard Stevens testified as a medical expert. (R. 1023,). On April 26, 2007, the ALJ issued a decision finding that Mr. Reed was not disabled because he retained the capacity to perform jobs that exist in significant numbers in the national economy. (R. 28-41). The Appeals Council initially denied Mr. Reed's request for review, but agreed to a remand under sentence six of §405(g) once Mr. Reed challenged the decision in federal court. (Dkt. #8, 10).[1] After considering some additional evidence and arguments, the Appeals Council again denied Mr. Reed's request for review on May 8, 2009 (R. 7), and that became the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.955; 404.981. Mr. Reed has filed an amended complaint appealing that decision under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.
## EVIDENCE OF RECORD

### A.
### Vocational Evidence

Mr. Reed was born on October 9, 1956, making him fifty years old at the time of the ALJ's decision. (R. 134). He dropped out of school after 11th grade, but later got his GED. (R. 1034). His work history consists of varied jobs for a labor service: machine operator, forklift operator, general laborer, and janitor. (R. 167). These jobs ranged from

---

[1] In the order remanding the case under sentence six, the court stated "[c]ivil case terminated." This was clearly a clerical error because the case is not terminated in a sentence-six remand and the court retains jurisdiction. *Melkonyan v. Sullivan,* 501 U.S. 89, 98 (1991); *Curtis v. Shalala*, 12 F.3d 97, 100 (7th Cir. 1993). Moreover, the case remained open, and the parties and the court proceeded as though there had been no termination.

light to heavy, and was unskilled aside from the forklift operator position, which was semi-skilled. (R. 1078-79). He hasn't worked since 1997. (R. 167).

## B.
## The Medical Evidence

The medical record in this case is close to 800 pages and, as is usually the case in disability appeals, it is compiled in no discernible order, a fair portion of it is illegible, and much of it is irrelevant.[2] Although Mr. Reed has hypertension and pancreatitis, he concedes that he suffers no limitations from these impairments. He focuses instead on those limited portions of the record concerning his back problems, diabetes, and depression. (*Memorandum in Support of Plaintiff's Motion*, at 3).

On March 3, 2002, Mr. Reed sought treatment for back pain that he said made him unable to walk. (R. 751). Although he had been injured nine years earlier, the increase in pain occurred the previous day while he was shoveling snow. (R. 751). Upon examination, straight leg raising was negative, there was no muscle weakness in the lower extremities, and sensation and reflexes were normal. (R. 179). Mr. Reed had an x-ray and MRI of his lumbar spine. The x-ray revealed minimal osteophytes – bone spurring – at the margin of the lower lumbar spine. Disc spaces were well-preserved, and there was no evidence of spondylolisthesis – vertebral displacement. (R. 779). The MRI yielded similar results, with the major exception of what "appear[ed] to be a significant 3 mm central disc herniation at L4-L5 with displacement of the adjacent thecal sac and probable compression of the traversing neural elements." (R. 780-81). In April 2002,

---

[2] Apparently, some of the record even refers to a different individual. (*Memorandum in Support of Plaintiff's Motion*, at 5 n.4). Although named Anthony Reed, the individual has a different birth date. Mr. Reed claims to have had sessions for his depression with the social worker who authored the report, but submits in his motion that report does not refer to him. There appears to be no other record of Mr. Reed's sessions with the social worker, and he does not refer to any.

3

one of the physicians following Mr. Reed at his local clinic noted that his range of motion was normal, as was his motor strength in all limbs. (R. 205). The examination was similarly normal on April 15th and April 18th. (R. 244-45, 256). There was no tenderness noted along Mr. Reed's spine on the 18th. (R. 244). On March 19, 2003, the nurse practitioner treating Mr. Reed said he was "unable to perform any heavy lifting, especially involving bending and turning." (R. 180).

In January 2006, Mr. Reed's treating physician, Dr. Nizam, completed a "Physical Capacities Evaluation" form. (R. 417-19). He reported that only Mr. Reed's back pain resulted in any physical or functional limitation on Mr. Reed's ability to work. (R. 419). He opined that he could perform light exertional work, with a limitation to occasional climbing, stooping, and operating foot controls. (R. 417, 419). There was no limitation on Mr. Reed's ability to reach or use his hands for fine or gross manipulation. (R. 419).

Mr. Reed also has a history of treatment for diabetes, beginning about 2002. He has been hospitalized or treated in the emergency room on four occasions for elevated glucose levels – in January 2004 (R. 385), in July 2004 (R.294-98, 336-37), in February 2006 (R. 433, 608-11), and in September 2006 (876-83). In the July 2004 incident, it was reported that Mr. Reed was experiencing syncope, and toxicology screening was positive for marijuana, cocaine, and opiates. (R. 296). On other occasions when Mr. Reed sought medical care, his glucose levels were elevated to a lesser degree – November 2005 (R. 410), January 2007 (R. 921, 957) – or more often, within normal limits – April 2002 (R. 198), July 2003 (R. 428), November 2003 (R. 396), April 2004

4

(R. 394), February 2006 (following treatment earlier in February)(R. 460), and April 2006 (R. 464).

Dr. Nizam also filled out a diabetes questionnaire in January 2006. (R. 402-06). He reported that Mr. Reed had been diagnosed with Type II diabetes in 2002, and that he had treated him for the condition since November 2003. (R. 402). Tests indicated hyperglycemia, but no ketosis, acidosis, or hypoglycemia. (R. 403). He called Mr. Reed's response to treatment "fair" and characterized his diabetes as "somewhat controlled," as opposed to "well-controlled" or "poorly controlled." (R. 405). Mr. Reed's condition was asymptomatic, however, and there had been no evidence of vascular complications, neuropathy, paresthesia, or slow healing. (R. 403-04). There was no effect on gait or motor function. (R. 404-05).

On January 30, 2007, Dr. Ana Gil performed a consultative psychiatric examination. (R. 945-51). After interview and examination, she diagnosed dysthymic disorder (secondary type), history of chronic alcohol dependence and abuse for thirty years – Mr. Reed said he had not drank for four years – and history of chronic cannabis dependence and abuse for twenty years – he said he had not used marijuana for ten years. (Tr. 948). She noted that Mr. Reed said his treating physician, Dr. Nizam, had given him Zyprexa for depression. (R. 945). She also completed a "Mental Residual Functional Capacity Assessment" form and indicated that Mr. Reed had a moderate limitation in his ability to perform four of the mental work-related activities listed on the form: ability to maintain a schedule, ability to maintain a normal work week without interruption due to psychological symptoms, ability to travel in unfamiliar places or use public transportation, ability to set realistic goals or make plans independently of others. (R.

949-50). Mr. Reed was not significantly limited in his ability to perform in the sixteen remaining areas, such as remembering and carrying out both simple and detailed instructions, maintaining concentration for extended periods, sustaining an ordinary routine without supervision, working in coordination with others, getting along with co-workers and the general public, and responding appropriately to changes in a work setting, activities (Tr. 949-50).

Dr. Hilton Gordon performed a consultative internal medicine examination on January 30, 2007. (R. 891-95, 952-59). When he interviewed Mr. Reed regarding his diabetes, Mr. Reed denied neuropathy, polyuria, or polydipsia. (R. 952). Also, contrary to what he had told or would tell Dr. Gil that same day, Mr. Reed conceded that he drinks a little each week. (R. 952). He found that Mr. Reed had a full range of motion in all extremity joints. (R. 953). Gait was normal, as were motor strength, reflexes and sensation. (R. 954). His grip strength and dexterity were normal, as were his gross and fine manipulation. (R. 953). Range of motion in Mr. Reed's lumbar spine was 70/90 flexion and 20/30 extension associated with pin. (R. 954). There was slight tenderness in the lumbar spine upon palpation. (R. 954).

Mr. Reed takes several medications: Insulin and Metformin for diabetes; Coreg and Lisinopril for hypertension; Furosemide, which is a diuretic; Acetamenophin with Codeine for pain; and Ibuprofen, an anti-inflammatory. (R. 1073).

### C.
### The Administrative Hearing Testimony
### 1.
### The Plaintiff's Testimony

At the hearing, Mr. Reed testified that he was single and lived at the YMCA. (R. 1036). He said he had not worked since 2001 due to the pain in his back and arthritis.

(R. 1036). Mr. Reed explained that he injured his back years ago, and thereafter did temporary day labor but the pain became to severe to continue with that. (R. 1036). The pain was in his lower back, and recently, it sometimes radiated down his left leg. (R. 1043). The pain was not always intense, "sometimes less, sometimes more." (R. 1044). Mr. Reed stated that he also had arthritis in his hands and knees. His hands didn't hurt all the time, and when they did, he rated the severity at 5 out of 10. (R. 1047). Bad weather seemed to make it worse. (R. 1047). His knees hurt daily, whenever he walked. (R. 1048). Mr. Reed said he could walk six or seven blocks, but would have to take breaks because he could only walk about fifteen minutes at a time. (R. 1051). He thought he could stand for forty-five minutes and sit for an hour at a time before he had to walk around a bit. (R. 1051-52). He could bend at the waist, but not stoop because it hurt to bend his knees. (R. 1053). He could button his clothes and pick up small objects. (R. 1053). Mr. Reed takes ibuprofen and acetaminophen with codeine for his pain. (R. 1037).

Mr. Reed said he didn't go out socially because it hurt him to get around – walking, going up and down stairs – and he didn't have money to go out. (R. 1054). Friends visited him in the dayroom of the YMCA – they weren't allowed upstairs. (R. 1067). He also had a couple of friends in the building. (R. 1067). He took Zyprexa for depression, and prior to that, Zoloft. (R. 1055). The medicine "knoks [sic] [him] out." (R. 1064). He took it at night for that reason. (R. 1065). He said he was able to follow a two-hour movie and read a couple of chapters in a book at night before he got tired. (R. 1055).

Mr. Reed took insulin for his diabetes. (R. 1042). He said he had to urinate frequently – once or twice an hour – but wasn't sure it was due to his diabetes or medication. (R. 1062). He explained that he drank water frequently because the doctor had recommended he flush out his system. (R. 1063). He had to get up twice a night to urinate as well. (R. 1066).

Mr. Reed said he didn't take physical therapy because he didn't have bus fare to get to the county hospital. (R. 1049). He got his medical care one a month at a clinic walking distance from the YMCA – four or five blocks. (R. 1049). He said he could only sit for about an hour and a half. (R. 1039). He thought he could drive a car for short trips. (R. 1039). He could cook, but needed help cleaning his room because he was unable to lift or move anything by himself. (R. 1039). He was able to sweep and vacuum. (R. 1040). Mr. Reed used the exercise facility at the YMCA. He did exercises for his back like deep knee bends against a wall. He lifted fifty-pound weights. (R. 1040). The pool was closed for the time being, so he was unable to swim. (R. 1040). He spent much of the day reading, and liked to play pool, cards, and backgammon. (R. 1041). He needed someone to grocery shop with him because he could bring the food home himself as there is no elevator in his building. (R. 1041). Sometimes he needed help carrying his laundry. (R. 1042). He said he couldn't carry more than ten pounds. (R. 1042).

**2.
The Medical Expert's Testimony**

Dr. Stephens testified that degenerative disc disease in the lumbar spine was Mr. Reed's primary problem. (R. 1069). There was no evidence of radiculopathy, however – there were no motor or reflex deficits in his extremities. (R. 1070). Range of motion in

the lumbar spine was limited to 70 out of 90 degrees. He noted there was no objective evidence of arthritis in the knees or hands. (R. 1069). Mr. Reed was able to grip and perform fine manipulation. (R. 1070). Mr. Reed's diabetes had not resulted in any end organ damage. (R. 1069). The amount of insulin he took was not unusual. (R. 1071). Diabetes wouldn't ordinarily cause one to urinate frequently unless blood sugar levels were frequently out of control. (R. 1071). The diuretic that Mr. Reed took, however, could. (R. 1073). Dr. Stephens noted that there was no record of that, and moreover, that Mr. Reed had denied frequent urination was a problem at his consultative examination. (R. 1071). Dr. Stephens felt that Mr. Reed did not have an impairment that met the listings, and that he could perform medium work involving only occasional stooping, bending, crawling, and crouching. (R. 1071-72).

### 3.
### The Vocational Expert's Testimony

The ALJ asked the vocational expert (VE), Frank Mendrick, to assume an individual like Mr. Reed had the capacity to perform light work, with limited reaching and occasional bending, stooping, crawling, and crouching, and involving no more than simple tasks. (R. 1080). The ALJ asked whether the RFC had to reflect that the individual needed one restroom break an hour. Mr. Mendrick said that "[p]eople get basically five minutes an hour. A lot depends on the work site but . . . five minutes an hour is reasonable. (R. 1080). Mr. Mendrick testified that such a person could perform Mr. Reed's past work as a janitor. (R. 1080-81). Although most of Mr. Reed's past work was unskilled (R. 1079-80), only the janitorial work was categorized as simple. (R. 1081). They could also do general assembly work (7000 positions in the region), simple inspection work (4000), and hand packaging jobs (10,000). (R. 1081). Then the

bathroom break question came up again. The ALJ again asked about a person being able to take one bathroom break an hour. (R. 1082). This time, the VE said "[i]t would be a concession in the type of work I gave you . . . [t]he normal breaks are 15, 20 minutes in the morning, same I the afternoon, and a half hour to 45 minutes for lunch." (R. 1082).

Returning to the previous hypothetical, the ALJ added an inability to work with the public and limited interaction with fellow employees. The VE said those restrictions would not affect the general assembly work, simple inspection work, or hand packaging work. (R. 1082). Additionally, the VE testified that if a person with the foregoing restrictions could perform medium-level lifting, they could also do machine tending work/automated packaging. (R. 1083). If that were lowered to sedentary, a person could do the same jobs listed earlier, but the number of positions would be reduced to 3500 general assembly jobs, 1800 inspection jobs, and 1200 hand packaging jobs. (R. 1084). Mr. Reed's attorney then asked whether a person who was late five days a week within a six month period could maintain employment; the VE said no. (R. 1087).

### D.
### The ALJ's Decision

The ALJ found that Mr. Reed suffered from the following severe impairments: degenerative disc disease, insulin dependent diabetes (controlled), and dysthymic disorder. (R. 33). She further found that these impairments did not meet or equal a listed impairment, specifically listings 1.04, covering disorders of the spine, and 12.04, covering affective disorders. (R. 35).

Next, after summarizing the evidence in the medical record and discussing Mr. Reed's testimony, the ALJ determined that he could perform work that required lifting no more than 20 pounds at a time with frequent lifting or carrying of up to 10 pounds and

10

standing or walking and sitting for six hours, as long as it was limited to simple tasks, involved only limited reaching overhead, and entailed only limited exposure to the general public and co-workers. (R. 37). This was essentially a limited range of light work. Under the regulations, "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567(b); 416.967(b). The ALJ further found that Mr. Reed was not entirely credible as to the extent of the restrictions resulting from his impairments. (R. 38). She determined that Mr. Reed could not perform any of his past work. (R. 39). The ALJ then relied on the VE's testimony to find that Mr. Reed could perform jobs existing in significant numbers in the regional economy. (R. 27-28). As a result, she concluded that Mr. Reed was not disabled as of August 31, 2006. (R. 28).

## IV.
## DISCUSSION

### A.
### The Standard of Review of the ALJ's Decision

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). The standard is a "lax" one. *Id.* Hence, the court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir.

2009); *Berger*, 516 F.3d at 544. Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Elder v. Astrue*, 529 F.3d 408, (7th Cir. 2008); *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). An ALJ is required to "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALJ's conclusion. *Sarchet v. Chater*, 78 F. 3d 305, 307 (7th Cir. 1996).

**B.**
**The Five-Step Sequential Analysis**

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352, *Brewer v. Chater,* 103 F.3d 1384, 1391 (7th Cir. 1997).

## C.
### Analysis

Mr. Reed points to two concerns with the ALJ's decision that he feels warrant a remand. First, he argues that the ALJ either did not factor in certain limitations the consulting psychiatrist found or did not adequately explain why she rejected them. Second, he contends that the ALJ failed to take his polyuria into account when arriving at her RFC finding. Other than that, Mr. Reed concedes with commendable candor that there is substantial evidence to support the ALJ's decision that he is not disabled. (*Plaintiff's Reply Memorandum*, at 2). At bottom, Mr. Reed's argument is that, although

the evidence supports the ALJ's decision, the ALJ didn't adequately explain how it does, and therefore did not build the requisite "logical bridge."

As Mr. Reed notes, Dr. Gil determined that he would be moderately limited in the ability to complete a normal work day and work week without interruption from psychologically based symptoms, to perform at a consistent pace without an unreasonable number and length of rest periods, to use public transportation or travel to unfamiliar places, and to set realistic goals or make plans independently of others. The ALJ acknowledged these findings in her opinion. She stated that "limiting [Mr. Reed] to simple work is responsive to" limitations in maintaining a schedule, completing a work day, and setting goals. (R. 37). She rejected the portion of Dr. Gil's opinion relating to public transportation, stating that he had indicated that he used public transportation unless he did not have carfare. (R. 37).

Mr. Reed argues without elaboration that Seventh Circuit precedent – *Stewart v. Astrue*, 561 F.3d679 (7th Cir. 2009); *Craft v. Astrue*, 539 F.3d 668 (7th Cir. 2008) – and Social Security Ruling ("SSR") 85-15 does not allow an ALJ to account for such limitations simply by limiting a person to simple work. Actually, SSR 85-15 does not really address accommodation of certain moderate mental restrictions with a limitation to simple work. It does however caution ALJ's that a limitation to unskilled work may not suffice:

> Because response to the demands of work is highly individualized, the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job. A claimant's condition may make performance of an *unskilled job* as difficult as an objectively more demanding job.

1985 WL 56857, *6 (emphasis supplied). The ALJ did not limit Mr. Reed to unskilled jobs, but *simple*, unskilled jobs. Not all unskilled jobs are simple, as the VE indicated in his testimony. (R. 1078-1081).

In *Craft*, the ALJ limited an individual whose mental limitations were variously were variously described as "mild limitations in activities of daily living, social functioning, and concentration, persistence, and pace" and moderate limitations in "concentration and pace, and . . . controlling his temper" – by limiting him to light work "except that he . . . cannot perform more than simple, unskilled tasks." 539 F.3d at 676-78. The Seventh Circuit held that there was "not an 'accurate and logical bridge' between the ALJ's recitation of the mental medical evidence and the decision to account for [the claimant's] mental impairments by limiting him to unskilled work." *Id.* at 677-78. In *Stewart*, the court decided the ALJ had failed in the task of logical bridge building by accounting for a claimant's "moderate difficulties in maintaining concentration, persistence, and pace" with a restriction to "simple, routine tasks that do not require constant interactions with coworkers or the general public." 561 F.3d at 682, 695.

But, at least as often – actually, more often – the Seventh Circuit has gone the other way. In *Sims v. Barnhart*, 309 F.3d 424 (7th Cir. 2002), there was medical evidence that the claimant suffered from organic brain damage, as well as depression and agoraphobia, that resulted in mild to moderate limitations in several areas of functioning, including maintaining concentration, persistence, and pace. *Id.* at 431. The Seventh Circuit had no problem with the ALJ translating these limitations into a restriction to work not involving complex tasks or unusual stress levels. *Id.* at 431-32. Similarly, *Johannsen v. Barnhart*, 314 F.3d 283 (7th Cir. 2002) found it appropriate for the ALJ to

15

accommodate the claimant's moderate limitations in the ability to maintain a regular schedule and attendance and complete a normal workday and workweek by limiting him to simple, repetitive work. *Id.* at 288-89. In *Jens v. Barnhart,* 347 F.3d 209 (7th Cir.2003), the court held that a claimant who "often experienced deficiencies of concentration, persistence, or pace" was capable of performing not just unskilled work, but *semiskilled* work. *Id.* at 213. More recently, in *Simila v. Astrue*, 573 F.3d 503 (7th Cir. 2009), the court determined that an ALJ adequately accounted for a clamant's moderate difficulties with concentration, persistence, and pace by limiting him to unskilled light work. *Id.* at 521-22. The Seventh Circuit has acknowledged, albeit in an unreported decision that, given its "countervailing" decisions on the subject, "there is uncertainty in the law regarding the formulation of hypothetical questions accounting for mental limitations." *Kusilek v. Barnhart*, 175 Fed.Appx. 68, 71, 2006 WL 925033, *3 (7th Cir. 2006).

In the end, the ALJ did not run afoul of any of the foregoing authority on the "no logical bridge" side of the issue. As already noted, he did not limit Mr. Reed to all unskilled work, but a subset consisting of *simple*, unskilled work. SSR 85-15 does not preclude that. And the ALJ did not find that Mr. Reed had *moderate* restrictions in maintaining concentration, persistence and pace as was the case in *Craft* and *Stewart*. Instead, she clearly found that he had only *mild* restrictions in that area. (R. 35). This is supported by Mr. Reed's reading novels and playing games of backgammon and pool, as well as Dr. Gil's finding that he had no limitations in six of eight facets in the area of sustaining concentration and persistence. (R. 649-50). He could remember and carry out both simple and detailed instructions, maintain concentration for extended periods,

sustain routine without supervision, work in coordination with others, and make simple, work-related decisions. (R. 949). Moreover, "the record indicates that the VE 'independently learned of the limitations (through other questioning at the hearing or outside review of the medical records, for example) and presumably accounted for them.'" *Simila*, 573 F.3d at 521 (quoting *Steele,* 290 F.3d at 942); *see* (R. 1076 (VE testifying he reviewed the record and listened to the testimony throughout the hearing). Accordingly, the ALJ adequately accounted for Mr. Reed's mental limitations in her RFC and in her hypothetical to the VE.

Mr. Reed's other argument for reversal deals with his claimed polyuria. He frankly concedes that "there was evidence from which the ALJ could have determined there was not a need to urinate as frequently as Mr. Reed described," but says that "some of the reasons stated by the ALJ to support her conclusions are contradicted by the record." (*Plaintiff's Reply Memorandum*, at 6). Again, Mr. Reed complains that the ALJ did not build a logical bridge between the evidence and her decision. (*Plaintiff's Memorandum in Support of Motion*, at 9).

On three bases, the ALJ rejected Mr. Reed's allegations that he had to go to the bathroom once per hour. First was the fact that his primary treating physician, Dr, Nizam, who found he could perform work, did not list in his report polyuria as a symptom Mr. Reed experienced. Second was the fact Mr. Reed denied polyuria as symptom of his diabetes during his consultative examination with Dr. Gordon. Mr. Reed does not attempt to deny that those two reasons are valid (*Memorandum in Support of Plaintiff's Motion*, at 9) – which they are. *Elder v. Astrue*, 529 F.3d 408, 414 (7th Cir. 2008)(ALJ may reject claimant's allegations if they conflict with what he tells

17

physician); *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008)(discrepancies between objective evidence and self-reports may suggest symptom exaggeration). As such, the ALJ's credibility finding must stand. It does not have to be "flawless," just not "patently wrong." *Simila*, 573 F.3d at 517. There is no requirement that *every* reason an ALJ provides for a credibility determination be indisputable; there just needs to be *some* support for it in the record. *Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008); *Schmidt v. Astrue,* 496 F.3d 833, 842 (7th Cir. 2007).

The third reason the ALJ gave, and the only basis of the ALJ's credibility determination that Mr. Reed challenges, is:

> [Mr. Reed] made a major point of the fact that he needs to urinate frequently, more than one time per hour. However, his need to urinate is not substantiated by the treatment notes. There have been no recent complaints of urination problems in the treatment notes. Since [Mr. Reed] emphasized a urination problem, one would expect consistent complaints to the treaters and perhaps changed medications. The complaints were early in [Mr. Reed's] treatment for diabetes mellitus in 2003. There are no complaints in the records for 2004-2006.

(R. 38). The objection is not that there *were* consistent complaints of polyuria in the record, but that there were six complaints during 2003-2006. (*Memorandum in Support of Plaintiff's Motion*, at 9). That's not particularly consistent given the extended, four-year period involved. And when the complaints are examined, it is clear that they were not consistent at all.

On one of these occasions, the April 17, 2003 report states, under "Genito-Urinary": "*no* abdominal pain, vomiting, polyuria, polydipsia." (R. 243). On another, just prior to that on April 7th, Mr. Reed complained of "frequent *night* urination" *for one week*. (R 275)(emphasis supplied). That would not interfere with work and obviously resolved quickly, given the April 17th entry. On a third, the report, dated July 31, 2003, is

18

essentially illegible. It may say "(+) polyphagia, polyuria, polydipsia", and it may say "no polyphagia, polyuria, polydipsia." (R. 278). What it says for sure is that whatever symptoms Mr. Reed was experiencing at the time were due to him not taking his medication for two weeks. (R. 278). The fourth report, from July 5, 2005, records a complaint of nocturia, which obviously would not interfere with work during the day. (R. 415). The final example is from September 13, 2006, when Mr. Reed complained of polyuria at a time, when, as in April 2003, *his diabetes was out of control*. (R. 879). What the ALJ had before her were three isolated instances of polyuria over the course of three years, either at night or when Mr. Reed was not taking his medication. What this shows is that Mr. Reed would not be affected during the workday if he took his medication or might be affected once in three years if his diabetes got out of control despite compliance with his medical regime. Even taken in a light least favorable to the ALJ, the record shows that all that may have escaped her was one instance of polyuria that would have affected Mr. Reed's ability to work only during a two-week period over the course of several years. The balance of the 800-page medical record not only supports her conclusion but the overlooked instance could not reasonably have affected her overall assessment or her decision. As it turns out, the ALJ was actually correct when she said there were no *consistent* complaints of polyuria in the record. Not only was the ALJ's credibility finding not "patently wrong," it was patently correct.

## CONCLUSION

The plaintiff's motion for summary judgment or remand is DENIED, and the Commissioner's motion for summary judgment is GRANTED.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

DATE: 12/13/10